# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br><br>ROBERTO VILLA (01),<br><br>        Defendant. | Case No. 18-20062-01-DDC |

## MEMORANDUM AND ORDER

This case's dense procedural history meanders between two countries, two federal judicial districts, and two distinct Article II agencies. It's best summarized in chronological sequence.

**September 5, 2018:** A grand jury in the District of Kansas returned a five-count Indictment against defendant Roberto Villa. Among other crimes, it charged Mr. Villa under 8 U.S.C. § 1326, accusing him of illegally reentering the United States after earlier removals in 2000 and 2003. (Doc. 1).

**September 13, 2018:** Mr. Villa was arrested in DeSoto, Kansas. (Doc. 2).

**October 2, 2018:** United States Magistrate Judge Teresa J. James ordered Mr. Villa released on conditions. One of those conditions required that he reside at a specified address in DeSoto, Kansas. Another required him to appear in a specified courtroom in our Kansas City, Kansas, courthouse on November 15, 2018. This was the date for the first Status Conference in the case against Mr. Villa. (Doc. 8).

**October 10, 2018:** The United States Immigration and Customs Enforcement ("ICE") deported Mr. Villa to Mexico. (Doc. 24).

**November 15, 2018:** Mr. Villa didn't appear for the Status Conference. His counsel appeared, however, and he reported that ICE had taken Mr. Villa into custody following Mr. Villa's release from the Marshal's custody. ICE then deported Mr. Villa from the United States. (Doc. 13). The United States then asked the court to issue a bench warrant for Mr. Villa's arrest. His counsel

opposed the motion, explaining that the United States had prevented Mr. Villa's appearance in court by deporting him. And so, counsel argued, the court shouldn't issue a warrant. The court directed the parties to file memoranda addressing the relevant legal authorities. (Doc. 13).

But this dispute proved fleeting. The government's request to issue a bench warrant seems to have overlooked that Judge James already had issued an Arrest Warrant on October 31 at the request of the United States Probation Office. *See* Doc. 20 (Warrant) & Doc. 11 (Petition for Action on Conditions of Pretrial Release). Later, the government moved to withdraw its oral motion for a Bench Warrant. (Doc. 14). The court granted this motion (Doc. 15), and the parties thus didn't submit the memoranda requested at the November 15 conference.

**December 5, 2018:** Border Patrol Agents arrested Mr. Villa near Cuevitas, Texas. Cuevitas is a "census-designated place" in Hidalgo County, Texas, adjacent to the Rio Grande River and near Los Ebanos, Texas. (Doc. 20).

**December 5, 2018:** Mr. Villa pleaded guilty in the United States District Court for the Southern District of Texas to knowingly and unlawfully entering the United States at a place other than one designated by immigration officials. The court sentenced him to 10 days custody and a $10 fine. Doc. 24. The same day of his plea and sentence, a law enforcement officer, acting on the warrant issued by this court, arrested Mr. Villa.

**January 22, 2019:** The United States Probation Office petitioned the court for action on Mr. Villa's conditions of pretrial release. *See* Doc. 24. Its petition sought an order asking Mr. Villa to show cause why the court should not revoke his pretrial release. *Id*.

**January 23, 2019:** Judge James conducted a detention hearing. The court found that Mr. Villa had violated his conditions of release but, for reasons explained on the record, Judge James ordered him released on the "previously set conditions" of release. (Doc. 25). Judge James also advised Mr. Villa that the court would conduct a status hearing in his case the next day, January 24. (Doc. 25).

**January 24, 2019:** The court conducted the status conference, and Mr. Villa's counsel appeared for it. But, Mr. Villa did not. His counsel advised that ICE again had taken Mr. Villa into custody. Counsel for the United States asked to continue the conference by one week so that it could secure a writ to bring Mr. Villa before the court. Mr. Villa's counsel advised that Mr. Villa didn't object, so the court continued the conference by one week, until January 31. The government announced it would submit a proposed writ and order to the court. (Doc. 28).

**January 25, 2019:** The government filed its motion seeking a Writ of Habeas Corpus ad prosequendum. (Doc. 29). A few days later, Mr. Villa filed his Objection to Writ of Habeas Corpus (Doc. 30).

These events now have crystallized into a narrow dispute: Should the court, as the United States has asked, issue a writ of habeas corpus ad prosequendum (Doc. 29)? This writ, if issued, would require ICE to bring Mr. Villa to federal court for hearings and trial. Mr. Villa's Objection (Doc. 30) argues that the court shouldn't insert itself into an apparent disagreement between two agencies in the Executive Branch of the United States government. The government's Response (Doc. 31) claims that Mr. Villa has misapprehended the writ it seeks.

**The Parties' Arguments**

The government's motion seeking a warrant (Doc. 29) is perfunctory. And appropriately so as Mr. Villa didn't appear to object to this request for a warrant. But when Mr. Villa filed his written Objection (Doc. 30), he argued that the government's request for a writ sought to "circumvent[] the Bail Reform Act and the Magistrate Judge's Order of Release." *Id.* at 1. Mr. Villa noted that Judge James had ordered him released under this Act—actually, she did so twice—and, each time, ICE elected to take him into custody. He argued that the Executive Branch of the federal government thus was acting to "keep him from appearing in court." *Id.* at 2. This argument relied extensively on Chief Judge Strand's opinion in *United States v. Villatoro-Ventura*, 330 F. Supp. 3d 1118 (N.D. Iowa 2018).

In that case, Judge Strand decided the government's appeal of a Magistrate Judge's order releasing the defendant pending trial. In short form, ICE had arrested the defendant and held him in custody until indicted two weeks later. ICE then transferred the defendant to the custody of the United States Marshal for his initial appearance and arraignment in the case. Defendant, invoking his rights under the Bail Reform Act, sought a detention hearing. At that hearing, the Magistrate Judge ordered the defendant released even though the government had represented that "release under the [Bail Reform Act] would result in ICE taking [defendant back] into

3

custody and deporting him before his trial date." *Id.* at 1122 (footnote omitted). This representation did not dissuade the Magistrate Judge from ordering the defendant released, but it persuaded her to stay the release order for seven days to give the government time to appeal. The government appealed but, it appears, it didn't do so within the seven day stay. In any event, the defendant was released from Marshal custody and ICE took him back into custody. ICE then announced a date certain for defendant's deportation—about two weeks hence. Judge Strand, "to ensure that [defendant] was not deported pending resolution of the Government's appeal" and defendant's motion to dismiss the indictment, granted a writ of habeas corpus ad prosequendum to bring the defendant back into Marshal's custody. *Id.* In a sweeping and comprehensive order, Judge Strand denied the government's appeal and ordered the defendant released on conditions. Also, Judge Strand dissolved his writ of habeas corpus ad prosequendum. *Id.* at 1143.

Mr. Villa endorses Judge Strand's rationale and result. He argues that the court should follow Judge Strand's lead and decline to issue a writ to prevent ICE, in effect, from deporting the defendant before his case can reach trial. Relying on the case from the Northern District of Iowa, Mr. Villa argues that this court should not "protect the Executive Branch from itself by keeping [a] writ of habeas corpus prosequendum in place." *Id.* In other words, Mr. Villa contends, an Article III court shouldn't use its writ powers to prevent an Article II agency from deporting him before the Department of Justice—another Article II agency—can prosecute him at trial. Doc. 30 at 2–3.

In response, the United States argues that its request differs from the one made in *Villatoro-Ventura*. Specifically, the government's Objection explains, the government "is not requesting the defendant be transferred back into U.S. Marshal custody to be detained. We are

4

simply asking this Court to order ICE to transport the defendant to future court proceedings, as the defendant is in custody by way of an ICE detainer." Doc. 31 at 2. The government cites no legal authority suggesting why this distinction matters.

**Analysis and Holding**

The court has concluded that it should deny the government's motion for a writ of habeas corpus ad prosequendum (Doc. 29). The following paragraphs explain why.

Federal law already gives the United States Attorney's Office all the power it needs to secure Mr. Villa's appearance for trial. As Judge Strand explained in *Villatoro-Ventura*, when an alien is subject to a removal order, "the Executive Branch 'shall remove the alien from the United States within a period of 90 days,' or within the 'removal period[]'" fixed by statute. 330 F. Supp. 3d at 1128 (citing 8 U.S.C. § 1231(a)(1)(A)). But this deadline is subject to regulations authorizing any "departure-control officer" to prevent an alien's departure from the United States for a variety of reasons—including any reason deemed "prejudicial to the interests of the United States under the provision of [8 C.F.R.] § 215.3." *Id.* at 1130 (citing 8 C.F.R. § 215.1). This regulation addresses the very circumstance presented by Mr. Villa's case—an alien subject to deportation who also is a party to a pending criminal case in federal court.

The regulatory structure of this regulation takes a bit to unwind. Section 215.3 provides that the "departure from the United States of any alien within one or more of the following categories shall be deemed prejudicial to the interests of the United States." 8 C.F.R. § 215.3. One category of prejudice arises if the alien "is needed in the United States . . . as a party to, any criminal case . . . pending in a court of the United States"—unless, that is, the "appropriate prosecuting authority" consents to the alien's departure. *Id.* § 215.3(g). Also, a related regulation provides, "No alien shall depart . . . from the United States if his departure would be

prejudicial to the interests of the United States under § 215.3." 8 C.F.R. § 215.2(a). Indeed, these regulations mandate every departure-control officer who "knows or has reason to believe that the case of an alien comes within the provisions of § 215.3 *shall temporarily prevent the departure of such alien.*" *Id.* (emphasis added).

In sum, the United States Department of Homeland Security ("DHS") has promulgated regulations authorizing its departure-control officers to forestall an alien's departure from the United States when the alien is a party to a criminal proceeding in federal court. This agency asserts that it issued those regulations under statutory authority delegated by Congress. *See* 8 C.F.R. § 215.2 (citing 6 U.S.C. § 202(4), 236; 8 U.S.C. §§ 1101, 1103, 1104, 1184, & 1185; & Executive Order 13323 (Dec. 20, 2003)).

An Article III court has no business redistributing this careful distribution of power among separate Article II agencies. *United States v. Ailon-Ailon*, 875 F.3d 1334, 1337 (10th Cir. 2017). This conclusion embraces the rationale adopted by our Circuit in *Ailon-Ailon*. In that case, the Circuit decided whether an alien's involuntary removal by immigration authorities "would constitute flight of the sort that would justify [pretrial] detention" under the Bail Reform Act. 875 F.3d at 1335. Holding that it would not, the court of appeals recognized the tension that rests beneath the surface. "The problem here is not that defendant will absent himself from the jurisdiction, but that two Article II agencies will not coordinate their respective efforts . . . It is not appropriate for an Article III judge to resolve Executive Branch turf battles." *Id.* at 1339 (quoting *United States v. Barrera-Omana*, 638 F. Supp. 2d 1108, 1111 (D. Minn. 2009)). This decisive reasoning in *Ailon-Ailon* applies equally to the evident tension between Executive Branch agencies on display here. DHS has taken Mr. Villa into custody. As the earlier discussion reveals, that agency possesses the authority to keep Mr. Villa in the United States for

6

his trial. Whether it elects to do so is up to DHS, the Department of Justice, and the Chief Executive Officer of the United States. This court has no business deciding how a co-equal branch of government should resolve the priorities to favor one executive agency or another.

A final word about the government's effort to distinguish this case from *Villatoro-Ventura*: It is not persuasive. The United States argues that its motion doesn't ask the court to order the defendant back into Marshal's custody. Instead, it argues, the government just asks the court to issue a writ ordering ICE to bring Mr. Villa to court appearances and trial. But ICE has detained Mr. Villa under the laws and regulations governing its responsibilities. If those laws permit it to transport a detainee to a federal courthouse for a hearing or trial, ICE will know as much. And if they don't, the court has no business telling ICE to do something it isn't authorized to do.

## Conclusion

**IT IS THEREFORE ORDERED** that the government's Motion for Writ of Habeas Corpus (Doc. 29) is denied.

**Dated this 2nd day of April, 2019, at Kansas City, Kanas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**